UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

P.C., as Administrator of
the Estate of her son K.C.,

              Plaintiff,

    -against-

LISA TAYLOR, LAURI TOMASSI,
SHARON BUTLER, ERIC SADLON,
LEKISHA TERRELL, "HERSHANI" DOE,
and JOHN and JANE DOES, 1-20,

              Defendants.

**COMPLAINT**

5:12 Civ. 1171 (TJM/TWD)

Plaintiff P.C., as Administrator of the Estate of her son K.C., as and for her Complaint alleges as follows:

## NATURE OF THE CASE

1. This case is about the physical and psychological abuse of a severely disabled 22-year-old man at the hands of employees of New York State.

2. K.C. ("K.C.") was born on XXXXXXXX, 1988. He was severely disabled from birth, carrying diagnoses of CHARGE syndrome, mental retardation, and autism. He was non-verbal.

3. When K.C. was 21, his mother, P.C., enrolled him in the OD Heck Developmental Center, a full-time New York State residential treatment center for the disabled. OD Heck was only a two to three-hour drive from P.C.'s home, and was supposed to provide a safe, healthy, nurturing environment for disabled adults.

4. Instead, the staff entrusted to care for K.C. and other extremely vulnerable adults who resided in apartment 9D of the Consaul Road Program ("9D") at OD Heck tortured

1

and abused K.C., depriving him of the care and support he needed and the human dignity he deserved. Lisa Taylor, Lauri Tomassi, Sharon Butler, Eric Sadlon, "Hershani" Doe, and other staff repeatedly physically and verbally abused K.C., confined him to a gym mat, and starved him. K.C., who craved attention from staff and, despite his disabilities, could understand verbal directions and degrading comments about him, was powerless to stop or report these regular assaults against him. When K.C. was taken to the hospital on February 28, 2011 with symptoms of pneumonia, he was malnourished and suffering from various unexplained injuries. He died on March 30, 2011 at the age of 22.

5. Lisa Taylor, Lauri Tomassi, Sharon Butler, Eric Sadlon, Lekisha Terrell, "Hershani" Doe, and other staff promoted a culture of abuse of residents on 9D, including K.C., and conspired to cover up their criminal behavior. OD Heck failed as an institution to care for and protect K.C., an extremely vulnerable young man. It is time the staff who subjected K.C. to this tragic physical and emotional abuse be held to account.

## JURISDICTION AND VENUE

6. This action arises under the Fourth Amendment to the United States Constitution and state common law.

7. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a), 1367(a), and 2201.

8. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

9. K.C. was born on XXXXXXX, 1988. He died on March 30, 2011 at the age of 22. Despite his disabilities, K.C. was a playful young man who loved taking walks, pushing the cart at the grocery store, listening to the choir at church, and spending time with his family.

K.C. was subjected to repeated assaults and abuse while in the custody and care of the OD Heck Developmental Center, a full-time New York State residential treatment center. All the events giving rise to the complaint occurred in or near Schenectady, New York. At the time of his death, K.C. was a citizen of the United States and resided in Schenectady, New York.

10. P.C. is K.C.'s mother. P.C. is a citizen of the United States and resides in Syracuse, New York.

11. P.C. was named the Administrator of K.C.'s estate on June 21, 2012.

12. Defendant Lisa Taylor was a supervisor at OD Heck and was assigned to 9D, an area where adults diagnosed with mental retardation and/or developmental disabilities resided, during the time K.C. resided there. In this position, Taylor was responsible to ensure that K.C.'s treatment plan was followed. She was also responsible to supervise staff providing care, treatment, and rehabilitation to individuals, including K.C. While an employee at OD Heck, she assaulted and battered K.C., participated in the repeated assaults and batteries of K.C. by other staff members, and failed to prevent other staff at OD Heck from abusing K.C. while in her presence.

13. Defendant Lauri Tomassi worked at OD Heck and was assigned to 9D during the time K.C. resided there. She was responsible for providing care, treatment, and rehabilitation to individuals, including K.C., diagnosed with mental retardation and/or developmental disabilities. While an employee at OD Heck, she assaulted and battered K.C., participated in the repeated assaults and batteries of K.C. by other staff members, and failed to prevent other staff at OD Heck from abusing K.C. while in her presence.

14. Defendant Sharon Butler worked at OD Heck and was assigned to 9D during the time K.C. resided there. She was responsible for providing care, treatment, and

rehabilitation to individuals, including K.C., diagnosed with mental retardation and/or developmental disabilities. While an employee at OD Heck, she assaulted and battered K.C., participated in the repeated assaults and batteries of K.C. by other staff members, and failed to prevent other staff at OD Heck from abusing K.C. while in her presence.

15. Defendant Eric Sadlon worked at OD Heck and was assigned to 9D during the time K.C. resided there. He was responsible for providing care, treatment, and rehabilitation to individuals, including K.C., diagnosed with mental retardation and/or developmental disabilities. While an employee at OD Heck, he assaulted and battered K.C., participated in the repeated assaults and batteries of K.C. by other staff members, and failed to prevent other staff at OD Heck from abusing K.C. while in his presence.

16. Defendant Lekisha Terrell worked at OD Heck and was assigned to 9D during the time K.C. resided there. She was responsible for providing care, treatment, and rehabilitation to individuals, including K.C., diagnosed with mental retardation and/or developmental disabilities. While an employee at OD Heck, she assaulted and battered K.C., participated in the repeated assaults and batteries of K.C. by other staff members, and failed to prevent other staff at OD Heck from abusing K.C. while in her presence.

17. Defendant "Hershani" Doe worked at OD Heck and was assigned to 9D during the time K.C. resided there. She was responsible for providing care, treatment, and rehabilitation to individuals, including K.C., diagnosed with mental retardation and/or developmental disabilities. While an employee at OD Heck, she assaulted and battered K.C., participated in the repeated assaults and batteries of K.C. by other staff members, and failed to prevent other staff at OD Heck from abusing K.C. while in her presence.

18. At all times relevant hereto, defendants John and Jane Does # 1-20 (the "Doe Defendants"), whose actual names plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe" and "Jane Doe," were agents, servants, and employees of OD Heck. On information and belief, the Doe Defendants worked at OD Heck during the time K.C. resided there and participated in the repeated assaults, battery, and torture inflicted on K.C.

19. At all times relevant hereto, and in all relevant respects, Defendants acted under color of state law and within the scope of their employment at OD Heck.

20. Each and every Defendant is sued in his or her individual capacity.

## JURY DEMAND

21. Plaintiff demands trial by jury in this action.

## FACTS

*K.C.'s Childhood*

22. K.C. was born on XXXXXXX, 1988.

23. From birth, he had severe physical impairments, including difficulty breathing, hearing, and seeing. His diagnoses included CHARGE syndrome, Tetralogy of Fallot, and atrioventricular canal defect, among others. He was born blind and completely deaf in one ear.

24. From birth until 18 months, K.C. required 24-hour nursing care. He required oxygen to breathe, and he was fed through a feeding tube.

25. K.C. had more than 15 surgeries during his first 18 months. To help him breathe, doctors removed bones in his nose and performed a tracheotomy. He had surgery to

repair his heart, a myringotomy to relieve pressure in his ear, and an appendectomy. The surgeries left residual effects, some of which were addressed with later surgeries.

26. After K.C.'s many surgeries, he was able to breathe without oxygen. He also developed some vision.

27. During his childhood, K.C. was diagnosed with severe mental retardation, autism, reactive airway disease, and sleep apnea.

28. K.C. lived at home, under the care of his mother, P.C., until he was 13 years old. He was a resourceful child. Despite being almost totally nonverbal, he found ways to communicate through his behavior. His disposition was playful and often mischievous. Despite his disabilities, K.C. was loving and craved attention. K.C. loved his mother and would follow her from room to room.

29. At age three, K.C. attended school in a special class for disabled children. At the time, K.C. and his family were living in Houston, Texas. He liked to do puzzles. He remained at the same school until he was nine years old.

30. When K.C. was nine years old, his family moved to Syracuse, New York. He attended the Percy Hughes Academic Magnet School in a special education class from ages 9 to 13.

31. K.C. then attended sixth grade at Clary Middle School, but he stayed there less than one year.

32. Aware that K.C. needed a higher level of care in order to thrive, P.C. consulted with an employee at the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") to determine the best treatment option for K.C. P.C. reluctantly agreed to OMRDD's recommendation to send him to Heartspring, a specialized

facility in Wichita, Kansas, because, according to OMRDD, there were no options in New York. K.C. first went to Heartspring for one to two months before he returned home. K.C. had a tracheostomy tube and sleep apnea, and Heartspring was unable to care for him at the time.

33. K.C. again attended Clary Middle School briefly before he was provided home schooling to address his special needs.

34. Again at age 14, K.C. returned to Heartspring, where a space for the level of care K.C. required had become available. He remained there until he turned 21 years old. P.C. was in weekly telephone contact with him. K.C. visited P.C. and other family members twice every year, once over the summer and once at Christmas.

35. While at Heartspring, K.C. was able to walk on his own without difficulty and with a hunched posture, follow commands to sit down and stand up, respond to sounds in his environment, smile and make eye contact, and sign and gesture to indicate what he wanted.

*K.C. Is Enrolled at OD Heck*

36. Upon turning 21, K.C. could no longer stay at Heartspring, a facility for adolescents, and OMRDD paid to bring him back to New York. On June 7, 2010, P.C. enrolled K.C. at OD Heck based on OMRDD's recommendation, and the proximity of OD Heck to P.C. and K.C.'s siblings in Syracuse, New York.

37. K.C. was placed in apartment 9D of the Consaul Road Residential Program. He attended the on-site Day Program in Building 10.

38. P.C. was not permitted to see K.C. during his first three months at OD Heck. A staff member told P.C. a family visit might derail K.C.'s transition.

39. According to a treatment plan review after K.C.'s first month at OD Heck, K.C. was cooperative with staff and appeared to enjoy staff attention. Despite being non-verbal,

he communicated his wants and needs through gestures and sign language, had good receptive language skills, and was able to understand verbal commands. Staff noted that K.C. responded directly to staff conversations regarding his behavior, so they should not discuss his negative behavior when within earshot of him. Additionally, K.C. demonstrated comprehension of cause and effect.

40. OD Heck gave P.C. verbal reports every six weeks, and P.C. called periodically in addition. She was told K.C. was doing well. Staff told her he enjoyed riding his bicycle.

41. P.C. first visited K.C. at OD Heck in September 2010. Immediately, she noticed a change in K.C. At Heartspring, K.C. was happy, smiling, and vivacious. At OD Heck, he was quiet. When K.C. saw his mother during her first visit to OD Heck, he repeatedly went to get his shoes. He wanted to leave with his mother.

42. In November 2010, P.C. received letters from OD Heck informing her of allegations of abuse of K.C. by staff. The letters informed P.C. that OD Heck had opened an investigation and OD Heck would inform her of its outcome.

43. In December 2010, K.C. went home for his annual Christmas visit with his family. P.C. noticed K.C. was unable to see as well as he used to.

44. On the drive back to OD Heck, K.C.'s acting-out behaviors were extreme. Unable to express himself with words, he attempted to bite and scratch P.C. P.C. knew he was trying to stop her from returning him to OD Heck. But without words available to help him, K.C. was unable to convey the reason he did not want to return.

### *OD Heck Staff Repeatedly Torture and Abuse K.C.*

45. For K.C., life at OD Heck was torture. Staff physically and verbally abused him, confined him to a space the size of a cage, and intentionally starved him. OD Heck, an institution entrusted to provide care to New York State's most vulnerable, treated K.C. without any human dignity.

### *Staff Regularly Confine K.C. and Restrict His Movement*

46. K.C. spent his days on 9D confined to a small blue gym mat on the floor in the corner of a room. Staff, including upon information and belief Defendants Taylor, Tomassi, Butler, Sadlon, Terrell, and Does, expected him to remain confined to the small mat for most of the day, day after day, alone. He was permitted to leave this restricted area only when he soiled his pull-up and needed to be changed, or at meal times. While other residents of 9D might move around the living room or sit on the couch, K.C. was not permitted to move freely and only on rare occasions allowed to sit on the couch.

47. K.C. sometimes struggled to get off the mat. Able to walk and crawl unaided, he regularly attempted to leave the mat and join other residents in the living room area. But Defendants would not let him. As set forth below, Defendants repeatedly used physical and verbal abuse to keep K.C. confined. Responding to this inhumane treatment, K.C. remained on the mat and acted out by spitting, kicking, hitting himself, or attempting to hit staff.

### *Defendants Physically Abuse K.C.*

48. Defendants Taylor, Tomassi, Butler, and Sadlon repeatedly beat K.C. with two wooden sticks. Defendant Taylor, a supervisor, referred to these sticks as "the magic wand."

49. The two sticks were notched and broken, and painted blue. Staff kept the sticks within easy reach, either in a drawer of one of the end tables in the living room or in a

wooden cabinet where notes on residents were kept.

50. Upon information and belief, Defendants Taylor, Tomassi, Butler, and Sadlon beat K.C. with the sticks when he attempted to get off the mat. Even while trapped on the mat, they beat him with the sticks. When they did not want others to see them beat K.C., they would take him into the sensory room and continue the beatings there.

51. K.C.'s beatings were not reserved to the sticks. Defendants Tomassi, Butler, and Sadlon also used towels, washcloths, and socks to hit K.C. They also stuffed these items into his mouth when he was spitting.

52. On one occasion in October 2010 when K.C. had gained access to the couch, Defendant "Hershani" deliberately bent K.C.'s fingers backwards with the intent to abuse him and cause him pain. She stated she would not leave a mark so another staff member would not have to report the abuse incident.

53. On October 17, 2010, Defendant Terrell stepped on both of K.C.'s hands when he was trying to crawl off the mat. While she cruelly assaulted him, she told him to stay on the mat.

### *Defendants Subject K.C. to Constant Verbal Abuse*

54. Staff, including Defendants, treated K.C. as less than human.

55. Staff, including but not limited to Defendants, regularly yelled at him, including while they were beating him.

56. They called him, "it," "the thing," "the sparrow," "the walking plague." They said he should go back to Kansas.

57. On October 17, 2010, Defendant Butler yelled at K.C., called him "the sparrow" or "the thing," and hit him with a towel and the blue stick.

58. Staff, including but not limited to Defendants, complained to each other when they were assigned to care for K.C.

59. K.C. thrived on love and affection, but was made to feel unwanted almost every day that he resided on 9D.

### *Sharon Butler Deprives K.C. of Food and Water*

60. K.C. had difficulty eating and required specially pureed food and one-on-one supervision during meal times. He was at constant risk of aspirating food into his lungs.

61. When K.C. was upset or overstimulated during mealtimes, he threw his food and/or objects on the dining table. Helping K.C. eat at mealtimes was important; he weighed less than 100 pounds.

62. During breakfast on October 17, 2010, Defendant Butler gave K.C. food and a spoon, and then she ignored him. After eating only a few bites, K.C. threw his food. In response, Defendant Butler took away the rest of K.C.'s meal and denied him any food until the next meal time.

63. This was not the first time Defendant Butler intentionally deprived K.C. of food. Defendant Butler refused to allow K.C. to eat after he threw his food on October 16, 2010 and on multiple occasions before then.

64. Defendant Butler also denied K.C. water. In the living room of 9D there was a water fountain for residents to use. K.C. was cleared for sips of water between meals, and he was allowed to take sips from the water fountain. On October 17, 2010, K.C. attempted to reach the water fountain. But Defendant Butler pulled him away and pushed him back towards the corner onto his designated blue gym mat. She did not give him anything to drink.

*K.C. Has Unexplained Injuries When He is Rushed to the Hospital With Respiratory Failure on February 28, 2011*

65. OD Heck rushed K.C. to the hospital on February 28, 2011. He had signs of respiratory failure and possible pneumonia. He was unconscious and placed on life support.

66. OD Heck staff reported to the hospital that K.C. had been sedated due to behavioral issues prior to entering respiratory distress.

67. Tests administered at admission showed that K.C.'s protein stores were severely depleted and his nutrition risk was high.

68. K.C. was diagnosed with bacterial pneumonia. The infection had already spread to his liver and kidneys.

69. When K.C.'s family visited him in the hospital on March 2, they saw that K.C.'s upper lip was swollen, bruised, and cut. The cut was starting to form a scab.

70. On March 30, 2011, K.C. died at the age of 22. No autopsy was performed.

71. In short, multiple members of the staff of 9D repeatedly inflicted physical and verbal abuse on K.C., including Defendants Lisa Taylor, Lauri Tomassi, Sharon Butler, Eric Sadlon, Lekisha Terrell, and "Hershani" Doe. The culture of abuse was pervasive at OD Heck. K.C. was a daily victim of abuse, and of the cover up of that abuse, by Defendants and other staff on 9D.

## DAMAGES

72. As a direct and proximate result of Defendants' actions, K.C. suffered severe physical and emotional injury.

73. Defendants' acts were reckless, willful, wanton, and malicious, thus entitling plaintiff to an award of punitive damages.

### AS AND FOR A FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983, Fourth Amendment (All Defendants)

74. Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

75. By reason of the foregoing, using excessive force, assaulting him, confining him, imprisoning him, and seizing him, Defendants deprived K.C. of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

76. In addition, Defendants conspired among themselves to deprive K.C. of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution, and took numerous overt steps in furtherance of such conspiracy, as set forth above.

77. Defendants acted under pretense and color of state law and in their individual capacities and within the scope of their respective employments as state officers. Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said Defendants acted willfully, knowingly, and with the specific intent to deprive K.C. of his clearly established constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments of the United States Constitution.

78. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### AS AND FOR A SECOND CLAIM FOR RELIEF
### Assault and Battery (All Defendants)

79. Plaintiff repeats and realleges the foregoing as if the same were fully set

forth at length herein.

80. By the above, Defendants, acting in their capacities as staff, and within the scope of their employment, committed multiple, willful, unlawful, unwarranted, and intentional assaults and batteries upon K.C.

81. The assaults and batteries by Defendants were unnecessary and unwarranted in the performance of their duties and constituted unreasonable and excessive uses of force.

82. As a direct and proximate result of the assaults and batteries, K.C. sustained the damages hereinbefore alleged.

## AS AND FOR A THIRD CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress (All Defendants)**

83. Plaintiff repeats and realleges the foregoing as if the same were fully set forth at length herein.

84. Defendants' actions were extreme and outrageous.

85. Defendants' actions were undertaken with the intent to cause K.C. severe emotional distress and/or were done in disregard of a substantial probability of causing severe emotional distress.

86. As a result of Defendants' actions, K.C. suffered extreme and severe emotional distress.

87. As a result of Defendants' malicious and intentional infliction of emotional distress, K.C. suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

(A) an order awarding compensatory damages in an amount to be determined at trial, including without limitation, damages for K.C.'s severe physical and emotional injury;

(B) an order awarding punitive damages in an amount to be determined at trial;

(C) reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(D) directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

Dated: July 23, 2012
New York, New York

                                                EMERY CELLI BRINCKERHOFF
                                                         & ABADY LLP

                                                         _____
                                                         Ilann M. Maazel
                                                        Julia Einbond

                                                        75 Rockefeller Plaza, 20th Floor
                                                        New York, New York, 10019
                                                        (212) 763-5000

                                                        Counsel for Plaintiff